**Uriel C. HARRIS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 179, 1999.**

Supreme Court of Delaware.

Submitted: March 12, 2002.
Decided: June 13, 2002.

120

Charles M. Oberly, III, of Oberly & Jennings, P.A., Wilmington, Delaware, for appellant.

Timothy J. Donovan, Jr., Deputy Attorney General, Department of Justice, Wilmington, Delaware, for appellee.

BEFORE: VEASEY, Chief Justice, WALSH, HOLLAND, and STEELE, Justices, and HARTNETT, Justice (Retired),* constituting the Court en Banc.

VEASEY, Chief J.

This case is about constitutional protections prohibiting unreasonable searches and seizures that the judicial branch of government is obligated to enforce for the protection of the rights of all citizens, including the law-abiding as well as reprehensible drug traffickers and other criminals. Thus, we consider whether the police in this case met the constitutional requirement of reasonable suspicion to stop a car and probable cause to search its contents.

Lawful and apparently innocent behavior may be "meaningless to the untrained" but still raise reasonable suspicion of drug trafficking in the eyes of a reasonable,

prudent, and experienced police officer.[1] Reasonable suspicion may be based on the totality of the circumstances. In some instances, therefore, lawful and apparently innocent conduct may add up to reasonable suspicion if the detaining officer articulates "concrete reasons for such an interpretation." [2]

In this case, however, the detaining officer did not articulate how the defendant's lawful behavior matched the police's drug courier profile characteristics. As a result, we find that the detaining officer's belief that the defendant was a drug courier "was more an 'inchoate and unparticularized suspicion or hunch' than a fair inference [and] is simply too slender a reed to support the seizure in this case." [3] Therefore, under the Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution, the police lacked reasonable suspicion to stop and search the vehicle and its contents. Accordingly, we hold that the search and seizure in this case were unlawful, the evidence obtained from the illegal seizure should have been suppressed, and the judgment of the Superior Court must be reversed.

*Facts*

On April 30, 1997, Wilmington Police Detective Liam Sullivan, dressed in plain

---

* Sitting by designation pursuant to Del. Const. art. IV, § 38 and *Del.C.* § 5610.

1. *United States v. Cortez,* 449 U.S. 411, 419, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Quarles v. State,* 696 A.2d 1334, 1338 (Del. 1997) ("a pattern of behavior interpreted by an untrained observer as innocent could justify an investigatory stop when viewed by experienced law enforcement agents who are cognizant of current drug trafficking operations").

2. *Karnes v. Skrutski,* 62 F.3d 485, 496 (3rd Cir.1995) (reversing judgment as a matter of

law and remanding on the ground that the detaining officers might not have qualified immunity from the § 1983 suit because they lacked reasonable suspicion to stop the plaintiff) (quoted and reasoning adopted by *United States v. Wood,* 106 F.3d 942, 948 (10th Cir. 1997) (holding that police lacked reasonable suspicion to search a vehicle after stopping the driver for speeding because the apparently innocent behavior did not aggregate to reasonable suspicion)).

3. *Reid v. Georgia,* 448 U.S. 438, 442, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

clothes, stationed himself on the Wilmington train station platform to monitor inbound trains from New York City for drug couriers. Sullivan had received no tips regarding any person or that there would even be drugs coming into Wilmington on a train that day. But, he testified that "there's probably drugs on every train coming south from New York City."

That afternoon, Uriel Harris boarded a southbound train in Philadelphia. Harris testified[4] that he planned to meet his friend Dale Green at the Wilmington train station. Green was to drive Harris back to Aberdeen, Maryland, where Green apparently originated his trip earlier that day. Harris' train arrived in Wilmington about twenty-five minutes late. After leaving the train along with about twenty other passengers, Harris, who carried a backpack, looked over his shoulder three times between the train and the platform's exit doors. Sullivan testified that he became suspicious because Harris looked over his shoulder three times. Harris testified that he had never been to the Wilmington train station before and was uncertain about where to meet Green. Harris stated he was looking for the appropriate exit and for Green.

At this point, Sullivan decided that he and his partner Sergeant Whalen would conduct a drug interdiction[5] because Harris looked over his shoulder three times and fit a profile of a drug courier. Sullivan followed Harris down the platform exit steps into the station and observed Harris in the station lobby holding a green backpack, talking to another man and using a payphone. Sullivan left the train station to find Whalen and informed him that the target of an interdiction (who turned out to be the defendant, Harris) was on the phone and conversing as well with a man standing nearby, wearing a white bandanna (who turned out to be Green). Whalen responded that Green had just gotten out of a Ford Tempo with Maryland tags parked in front of Whalen's unmarked police vehicle. Whalen also told Sullivan that the car's driver was a woman, who remained in the car.

Just as Sullivan reentered the station and discovered that the two men, Harris and Green, were nowhere to be seen, Whalen radioed Sullivan to "get out here now." Sullivan testified that Whalen told him that, at first, he had not seen Harris in the vehicle but that Harris' head appeared or "popped up" in the backseat and looked toward the street corner when the car was approximately eighty feet away. Sullivan decided to pursue the Tempo and make a stop.

The Tempo entered Interstate 95 and headed south. Sullivan called for Wilmington and state police assistance in making the stop.[6] The Tempo left the

---

**4.** Harris testified at the suppression hearing. The facts summarized here are taken from that hearing.

**5.** At the suppression hearing, Sullivan testified:

> I've been trained extensively in the identification of couriers. I've also initiated an interdiction process in the city that I trained several people also to do that work. First initially, to identify usually through body language they display as they arrive or get off the trains and then subsequently approach them and engage in conversation.

> ... [Drug interdiction] basically is you watch people coming off the train.... You will watch individuals that appear to be nervous, looking over their shoulders, see if they're being followed, or constantly looking around for police presence.... It's basically you approach them and ask them to talk to that person.

**6.** When police are not in uniform, like Sullivan and Whalen, police protocol calls for marked units and officers to assist in stops for officer safety and identification.

interstate to head west, but two marked state police cruisers had blocked the bottom of the exit ramp by placing their vehicles in a "V" position. Sullivan and Whalen stopped their vehicle directly behind the Tempo. Sullivan drew his gun to his side and approached the vehicle as two state troopers stood in front of the Tempo with guns drawn and shouted, "State Police, put your hands up."

Sullivan looked in the back window and noticed that Harris did not have his hands in the air and that he was holding one strap of the green backpack. Sullivan opened the door, pointed the gun at Harris and said, "Police officer, put your hands up." Harris complied by raising his hands and releasing the backpack strap. Sullivan asked Harris whether the backpack belonged to him. Harris replied, "No, that's not my bag. I don't know whose it is." Green and the woman driver also denied ownership of the bag. Sullivan ordered everyone out of the car to be frisked for weapons and declared the bag to be abandoned property. Sullivan then searched the bag and found three clear plastic bags that contained over 200 grams of crack cocaine.

Harris was charged with possession of cocaine with intent to deliver and trafficking in more than 100 grams of cocaine. Harris moved to suppress the cocaine found in the backpack. After the suppression hearing, the Superior Court denied that motion. Harris was tried three times. The first two trials in March 1998 and September 1998, ended in mistrials. The last trial ended March 11, 1999 and resulted in a conviction of Harris on both counts. The Superior Court sentenced Harris to ten years in prison for possession of cocaine with intent to deliver and 15 years in prison for trafficking in more than 100 grams of cocaine. This is Harris' direct appeal.

### Issue on Appeal

Harris contends that Sullivan and the other police officers lacked the requisite justification to stop the vehicle in which he was riding and to search its occupants and contents. It is his position that the stop was unreasonable under the Fourth Amendment to the United States Constitution and under Article I, Section 6 of the Delaware Constitution. Harris argues that the stop constituted a full-blown search and seizure requiring probable cause and that the police did not have probable cause or even reasonable suspicion to stop him. If Harris is successful on this claim, all of the evidence against him obtained from the search would be inadmissible, requiring reversal of the Superior Court's judgment.[7]

▪ A trial court's determination of whether the State's warrantless search and seizure passes constitutional muster is an issue of both law and fact.[8] In this case, the facts are undisputed. Therefore, we review de novo the Superior Court's denial of Harris' motion to suppress the evidence obtained from the search and seizure of the Tempo in which Harris was a passenger.[9]

---

7. *Jarvis v. State,* 600 A.2d 38, 40 (Del.1991) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). *See also Jones v. State,* 745 A.2d 856 (Del.1999) (holding that, if the seizure was not supported by reasonable and articulable suspicion, anything police obtained as a result of that seizure is inadmissible at trial).

8. *Flonnory v. State,* 805 A.2d 854, 856 (Del. Supr. 2001) (citing *Jones,* 745 A.2d at 860).

9. *Id.* Technically speaking, Harris, as a mere passenger, lacks standing to object to the stop of the vehicle. *Jarvis,* 600 A.2d at 41 n. 1. There is no evidence in the record that Harris owned the vehicle or exercised control over it.

"No right is to be held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." [10] Therefore, the Fourth Amendment to the United States Constitution [11] and Article I, Section 6 of the Delaware Constitution [12] prohibit unreasonable searches and seizures by the State. [13]

■ The Government seizes a person within the meaning of the Fourth Amendment when an officer restrains the person through physical force or, in the absence of such force, the person submits to the officer's assertion of authority. [14] This Court has held that the Government seizes a person within the meaning of Article I, § 6 of the Delaware Constitution "when a reasonable person would have believed he or she was not free to ignore the police presence." [15]

He therefore had no reasonable expectation of privacy in the vehicle, per se, and he cannot object to its seizure by the police. *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Government of the Virgin Islands v. Williams*, 739 F.2d 936 (3rd Cir.1984)). It is doubtful, however, that Harris would have been free to leave once the vehicle had been stopped since Harris himself was detained. Therefore, Harris had standing to object to the circumstances under which his person was seized. *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 503, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

10. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citing *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)).

11. The Fourth Amendment declares: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV.* The Fourth Amendment extends to state action through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

12. Article I, Section 6 of the Delaware Constitution provides that: "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures...." Del. Const. art. I, § 6; *Jones*, 745 A.2d at 863 (noting that the Delaware constitution may in certain circumstances provide greater protections that the United

States Constitution in protecting citizens against unreasonable search and seizure).

13. *Flonnory*, 2001 WL 1398430, at *2 ("The right of individuals to be free from unlawful searches and seizures is secured in Delaware by both the guarantee of an individual's right under the Fourth Amendment to the United States Constitution ... and the nearly identical language of Article I, Section 6 of the Delaware Constitution.").

14. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding that a seizure under the Fourth Amendment "requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of [Government] authority") (emphasis in original).

15. *Jones*, 745 A.2d at 869. In *Jones*, this Court stated that the United States Supreme Court case of *Hodari D.* interpreting the Fourth Amendment "is not consistent with our view of when a person is 'seized' within the meaning of Article I, § 6 of the Delaware Constitution in that *Hodari D.* would allow a police officer lacking reasonable suspicion to create that suspicion through an unjustified attempted detention." *Id.* at 863–64. This Court held that whether "a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence." *Id.* at 869 (adopting the standard for defining a seizure from the United States Supreme Court decision in *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), holding that a government seizure

■ The police officers and state troopers forced the Tempo, in which Harris was a passenger, to halt. The state troopers blocked the interstate exit ramp with their vehicles and stood with guns drawn in front of the Tempo while shouting "State Police, put your hands up." Meanwhile, the police officers boxed in the Tempo by blocking the rear of the car with their vehicle. Officer Sullivan immediately approached the Tempo from behind with his gun drawn and, because Harris' hands were not raised, he opened the rear door of the Tempo next to Harris, pointed his gun at him, and said, "Police officer, put your hands up." By forcing the Tempo to halt, blocking it in with their vehicles, and surrounding it with their guns drawn, the police restrained Harris through physical force and consequently seized his person under the Fourth Amendment.[16] These actions by police also would have led a

reasonable person to believe that he was not at liberty to ignore police presence and go about his business and thus the police had also seized Harris under Article I, § 6 of the Delaware Constitution.[17]

After finding that the police actions constitute a seizure of Harris' person, we must determine next whether the police possessed the justification required for an investigatory stop to be lawful under either or both the Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution.[18] According to the United States Supreme Court's decision in *Terry v. Ohio* and its progeny, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"[19] This Court also has recognized the *Terry* stop standard[20]

occurs when the government agent's conduct "communicate[s] to a reasonable person that he [is] not at liberty to ignore the police presence and go about his business").

16. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547.

17. *Jones*, 745 A.2d at 869.

18. *Flonnory*, 2001 WL 1398430, at *3.

19. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry*, 392 U.S. at 7, 88 S.Ct. 1868). *See also, e.g.*, *United States v. Arvizu*, 534 U.S. 266, ——, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) ("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion...."); *Cortez*, 449 U.S. at 417, 101 S.Ct. 690 (describing reasonable suspicion); *Reid*, 448 U.S. at 440, 100 S.Ct. 2752 ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."); *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (noting reasonable suspicion is required to stop a vehicle).

20. *See, e.g., Jones*, 745 A.2d at 861 (citing *Terry*, 392 U.S. at 21, 88 S.Ct. 1868) ("[A] police officer may detain an individual for investigatory purposes for a limited scope and duration, but only if such detention is supported by a reasonable and articulable suspicion of criminal activity."); *Flonnory*, 805 A.2d at 854, 856 (citing *Terry*, 392 U.S. at 21, 88 S.Ct. 1868) (holding that "agents of the State may stop and detain an individual only when they have a reasonable and articulable suspicion of criminal activity"). The General Assembly even has codified the requirement of reasonable suspicion and a description of an investigatory stop at 11 *Del.C.* § 1902, which states:

(a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.

(b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours.

and has stated specifically that an automobile and its occupants may be subjected to a limited seizure by police based on reasonable suspicion.[21]

 Police suspicion of a person's involvement in criminal activity is reasonable if it is based on the detaining officer's "ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."[22] The United States Supreme Court has repeatedly noted that the reasonable suspicion standard is "not readily, or even usefully, reduced to a neat set of legal rules"[23] and "is somewhat abstract."[24] Thus, a finding of reasonable suspicion depends on "the concrete factual circumstances of individual cases."[25] Reasonable suspicion also " 'is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence.' "[26]

To determine whether the detaining officers had reasonable suspicion to seize the Tempo and its passengers, including Harris, this Court "must look at the 'totality of the circumstances' of [this] case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing."[27] The United States Supreme Court has noted that the totality of the circumstances "process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' "[28]

In *Quarles v. State*, this Court stated that, in drug seizure cases, the totality of the circumstances review requires looking at "the 'whole picture,' as viewed through the eyes of a police officer who is experienced in discerning the ostensibly innocuous behavior that is indicative of narcotics trafficking."[29] In *Quarles*, as in this case, we considered whether a police officer had reasonable suspicion to stop the defendant based on the police's drug courier profile and the defendant's behavior after disembarking at Wilmington's bus terminal.[30]

 This Court articulated a two-pronged standard for reviewing the conduct of detaining officers based on United States Supreme Court precedent.[31] First, courts must look at the totality of the circumstances, "including objective obser-

The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

21. *Jarvis*, 600 A.2d at 40–41.

22. *Coleman v. State*, 562 A.2d 1171, 1174 (Del.1989) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

23. *Ornelas v. United States*, 517 U.S. 690, 695–699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

24. *Arvizu*, 122 S.Ct. at 751.

25. *Terry*, 392 U.S. at 29, 88 S.Ct. 1868. *See also Karnes*, 62 F.3d at 493 n. 5 ("The inquiry into the existence of reasonable suspicion is fact-specific.").

26. *Woody v. State*, 765 A.2d 1257, 1263 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

27. *Arvizu*, 122 S.Ct. at 750 (citing, *e.g.*, *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690).

28. *Id.* at 750–51 (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690).

29. *Quarles*, 696 A.2d at 1337.

30. *Id.* at 1334.

31. *Id.* at 1338.

vations and 'consideration of the modes or patterns of operation of certain kinds of lawbreakers.' " [32] Second, courts must consider "the inferences and deductions that a trained officer could make which 'might well elude an untrained person.' " [33] In *Quarles*, the detaining officer testified that he viewed the following as "drug courier profile" characteristics: (1) the defendant came into Wilmington via bus from New York, a known drug source city; (2) he and his companion carried no luggage; (3) he arrived at night, when law enforcement presence is at a minimum; and (4) he traveled with a companion.[34] The "non-profile" characteristics relied upon by police in *Quarles* were that the defendant and his companion: (1) appeared startled and ended their conversation upon leaving the bus and seeing two uniformed police officers; (2) quickly left the bus terminal in a direction away from the officers; (3) repeatedly glanced over their shoulders to see if the officers were following them, before and after turning the street corner; (4) continued walking rapidly; and (5) abruptly turned around upon seeing a marked police car.[35] This Court concluded that "Quarles' suspicious behavior and the 'drug profile,' when taken as a whole from the perspective of one who is trained in narcotics detection, produces a reasonable articulable suspicion that a crime was afoot" and "conclude[d] that the police officers had a sufficient basis upon which to support an initial stop to question Quarles." [36]

In *Reid v. Georgia*, a case relied on and distinguished in *Quarles*,[37] the United States Supreme Court considered whether a federal drug enforcement agent could lawfully stop the defendant in an airport because he fit a "drug courier profile." [38] Specifically, the agent testified that (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags. In holding that the stop in *Reid* was not based on reasonable suspicion, the United States Supreme Court held:

> [T]he agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.[39]

Thus, under *Reid*, an " 'inchoate and unparticularized suspicion or hunch' " of experienced police officers is insufficient to

---

32. *Id.* (quoting *Cortez,* 449 U.S. at 417–18, 101 S.Ct. 690).

33. *Id.*

34. *Id.* at 1338.

35. *Id.*

36. *Id.* at 1339.

37. *Id.* at 1338 (citing *Reid,* 448 U.S. at 441, 100 S.Ct. 2752).

38. *Reid,* 448 U.S. at 441, 100 S.Ct. 2752.

39. *Id.*

support a finding of reasonable suspicion as a matter of law.[40]

Harris concedes that, under *Quarles* and *Reid,* drug courier profile evidence is admissible to determine whether the police have reasonable suspicion or probable cause regarding a defendant. Harris contends, however, that the information the police had in this case was quantitatively and qualitatively less than the information the police had in *Quarles* and is akin to *Reid* where it was held that the officers lacked reasonable suspicion as a matter of law. Furthermore, Harris continues, *Quarles* represents the outer limits of reasonable suspicion under the Fourth Amendment and the Delaware Constitution and, thus, when there are less compelling factors than in *Quarles* reasonable suspicion cannot be found.[41]

The totality of Harris' behavior at the train station and in the car was lawful and ostensibly innocent. Of course, there are "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity [is] afoot" [42] because it is possible for "objective facts, meaningless to the untrained," to provide the basis for reasonable suspicion in the eyes of a reasonable, prudent, and experienced police officer.[43] As the United States Court of Appeals for the Third Circuit has noted: "It is possible for factors, although insufficient individually, to add up to reasonable suspicion," but it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." [44] The Fourth Amendment "does not allow the law enforcement

40. *Id.* (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). *See also Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' ").

41. The American Civil Liberties Union filed amicus curiae briefs in this case. The ACLU contends that this Court should view this case as an opportunity to hold that Article I, Section 6 of the Delaware Constitution prohibits the State from using any type of profiling as factors to justify a warrantless search or seizure. The ACLU argues that this case demonstrates the danger of racial and drug courier profiling. Although both Harris and Green, the man he met at the station, are black, the police in this case did not testify that race was a factor in the drug courier profile or even a "non-profile" characteristic worthy of attention. Therefore, the issue of the constitutionality of racial profiling by law enforcement officials is not before us and we do not address it in this case. *See Morris v. State,* 795 A.2d 653, 661 (Del.Supr.) ("If we were to speak to the issue in this Opinion we would be expressing an advisory opinion, and that is not our proper function."). As for the specif-

ic issue of drug courier profiling, this Court in *Quarles* upheld the use of drug courier profile evidence to justify a search or seizure by law enforcement officials and noted: "Although the use of '[drug courier] profiling' is vigorously debated in academic circles, it has been accepted by the United States Supreme Court" as a factor in reasonable suspicion and probable cause determinations "when considered in conjunction with police observations." *Quarles,* 696 A.2d at 1338 (citing *Sokolow,* 490 U.S. at 9, 109 S.Ct. 1581). *Cf. Johnson v. State,* — A.2d ——, 2001 WL 34029629 at *2, 2001 Del. LEXIS 456 (Del. Supr.), at *10 (holding that "drug courier profile evidence may not be admitted during a criminal trial as substantive evidence of guilt"). Because Harris concedes drug courier profile evidence is admissible to determine whether a police search or seizure was lawful and this Court already ruled on that issue in *Quarles,* there is no need to discuss further in this case the use of drug courier profiling by law enforcement officials in Delaware.

42. *Reid,* 448 U.S. at 441, 100 S.Ct. 2752.

43. *Cortez,* 449 U.S. at 419, 101 S.Ct. 690.

44. *Karnes,* 62 F.3d at 496 (quoted by *Wood,* 106 F.3d at 948; *Cartnail v. State,* 359 Md. 272, 753 A.2d 519, 531 (2000)).

official to simply assert that apparently innocent conduct was suspicious to him or her; rather the officer must offer the factual basis upon which he or she bases the conclusion." [45]

The detaining officer in this case testified that he profiles drug couriers "usually through the body language they display as they arrive or get off trains" and by "watch[ing] individuals that appear to be nervous, looking over their shoulders, see[ing] if they're being followed, constantly looking around for police presence." The detaining officer relied on the following observations to suspect that Harris was a drug courier: Harris (1) looked over his shoulder three times between leaving the train and descending the platform staircase into the station; (2) met another man in the lobby; (3) used a payphone; (4) "popped" his head up in the backseat; and (5) looked out the rear window of the Tempo. The detaining officer never stated that Harris appeared nervous or concerned about evading detection by police or others. Thus, the detaining officer never explained how Harris' behavior matched the characteristics of the police's drug courier profile.

■ Without a cogent explanation, Harris' seemingly innocent conduct pro-

vides no basis for a finding of reasonable suspicion even in the eyes of a reasonable, prudent, and experienced police officer. Rather, the detaining officer's belief that Harris was a drug courier fails the test of *Reid* because it "was more an 'inchoate and unparticularized suspicion or hunch' than a fair inference in light of his experience [and] is simply too slender a reed to support the seizure in this case." [46] Harris' behavior as described by the detaining officer, like that of the defendant in *Reid,* is consistent with "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." [47] This is precisely what the constitutional prohibition against unreasonable searches and seizures was designed to prevent. Therefore, we hold that, as a matter of law under the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution, the police could not reasonably have suspected Harris of criminal activity based on the objective facts and the subjective interpretation of those facts described by the detaining officer in this case.[48]

**45.** *Cartnail,* 753 A.2d at 531 (finding an investigatory traffic stop to be unlawful because of a lack of reasonable suspicion and holding that a set of innocent circumstances cannot add up to reasonable suspicion unless they establish an objective inference that would lead a reasonable and prudent officer to make the stop).

**46.** *Reid,* 448 U.S. at 441, 100 S.Ct. 2752 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

**47.** *Id.*

**48.** Our holding in this case thus rests on two independent yet equal grounds: the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution. *See Michigan v. Long,* 463 U.S. 1032,

1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (recognizing that state law, if separate and independent from federal law, may provide an adequate and independent ground for a state court's decision and that "[i]f the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent [state law] grounds, we, of course, will not undertake to review the decision"). We again adopt a United States Supreme Court standard to interpret the protections of Article I, § 6 of the Delaware Constitution and hold that, under Article I, § 6 of the Delaware Constitution, the State must have reasonable articulable suspicion in order to seize a person lawfully. *See Jones,* 745 A.2d at 869 (adopting the standard for defining a seizure from the United States Supreme Court deci-

The Fourth Amendment also permits the warrantless search and seizure of a vehicle and its occupants where there is probable cause,[49] but probable cause is an even more demanding standard than reasonable suspicion.[50] Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."[51] Thus, probable cause exists if the facts known before the search and seizure would justify the issuance of a warrant.[52] Because the police officers lacked reasonable suspicion to stop Harris, they also lacked probable cause to search his backpack located in the car.

By finding the police lacked reasonable suspicion to stop Harris as a passenger in a vehicle, "we give teeth to the notion that the courts cannot accord police carte blanche to pick and choose whom to stop based on some 'hunch' that a motorist, or his or her passengers, are involved in criminal activity."[53] Furthermore, as Justice Scalia has noted for the United States Supreme Court, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."[54]

It is vital that our society retains its balance by expecting that courts, enforcing the rule of law, will uphold our cherished constitutional liberties that protect both the innocent and guilty. Those constitutional protections, guaranteed by the Founders in the Eighteenth Century both in Delaware and nationally, must not be compromised or eroded because of the concerns of the moment, whether they be about drug traffic or even the safety of our society. As Benjamin Franklin declared contemporaneously with the establishment of these protections: "They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety."[55]

### Conclusion

The totality of the circumstances in this case fails to support reasonable suspicion

sion in *Chesternut*, 486 U.S. at 569, 108 S.Ct. 1975, holding that a government seizure occurs when the government agent's conduct "communicate[s] to a reasonable person that he [is] not at liberty to ignore the police presence and go about his business"). *See, e.g., Arvizu*, 122 S.Ct. at 750; *Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581; *Cortez*, 449 U.S. at 417, 101 S.Ct. 690; *Reid*, 448 U.S. at 440, 100 S.Ct. 2752; *Terry*, 392 U.S. at 7, 88 S.Ct. 1868 (all describing the reasonable suspicion standard).

49. *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Brinegar v. United States*, 338 U.S. 160, 164, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). *Cf. State v. Carty*, 170 N.J. 632, 790 A.2d 903, 912 (2002) (holding that under the New Jersey Constitution, in order for driver consent to a warrantless search of a motor vehicle and its occupants to be valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing beyond the initial valid motor vehicle stop before seeking consent to search).

50. *Ornelas*, 517 U.S. at 695, 116 S.Ct. 1657 (citing *Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690).

51. *Id.* at 696, 116 S.Ct. 1657 (citing *Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *Brinegar*, 338 U.S. at 175–76, 69 S.Ct. 1302).

52. *Dyson*, 527 U.S. at 467, 119 S.Ct. 2013 (citing *United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).

53. *Cartnail*, 753 A.2d at 532.

54. *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

55. *See* Bartlett's Familiar Quotations 348 (Emily Morris Beck ed., 1980); The Oxford Dictionary of Political Quotations 141 (Anthony Jay ed., 1996).

required for a police stop. The police would not have discovered any evidence of illegality but for the illegal seizure and search. Therefore, the Superior Court erred by denying Harris' motion to suppress and by admitting the evidence of cocaine found in Harris' backpack. Accordingly, the judgment of the Superior Court is **REVERSED** and **REMANDED** for proceedings consistent with this opinion.