**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,      )
                        )
         v.             )  ID No. 1810015149
                        )
MURAD T. DIGGS,       )
                        )
        Defendant.    )
                        )
                        )

**MEMORANDUM ORDER DENYING
MOTION TO SUPPRESS**

Upon consideration of the Motion to Suppress Evidence (the "Motion") filed by Defendant Murad T. Diggs on March 11, 2019; the State's Response to Defendant's Motion to Suppress (the "Response") filed by the State of Delaware on March 22, 2019; the evidence provided by the parties at a hearing begun on March 29, 2019 (the "Hearing"); the arguments made on the Motion and Response by the parties at the Hearing; the unsolicited letter from Misty A. Seemans, Esq. to the Honorable Eric M. Davis submitted after the Hearing on April 1, 2019 (the "Letter"); and for the reasons set forth below, the Motion is **DENIED**.

### INTRODUCTION

This is a criminal action. The State has charged Mr. Diggs with: (i) possession of a firearm by a person prohibited; (ii) possession of ammunition by a person prohibited; (iii) carrying a concealed deadly weapon; and (iv) resisting arrest. On October 26, 2018, a citizen contacted Corporal Alexander Marino of the Wilmington Police Department ("WPD"), by way of Corporal Marino's personal cellphone, regarding a black male, age 30-35, wearing a camouflaged-styled jacket with a handgun in his waistband. According to the citizen, the black male was entering into a store located at the corner of Chestnut Street and S. Harrison Street.

Corporal Marino was not on duty so he relayed the information to on-duty WPD Officer Raymond Shupe.

Officer Shupe responded to the area of S. Harrison Street and observed four to five black males—including a black male, age 30-35, wearing a camouflaged-styled jacket—walking down S. Harrison Street towards Elm Street. Officer Shupe saw the black male enter the Market on the corner of S. Harrison Street and Elm Street. Officer Shupe called for back-up and, after back-up arrived, approached the Shop Smart Market (the "Market"). As Officer Shupe entered the Market, Officer Shupe immediately encountered the black male, later identified as Mr. Diggs and asked to speak to him. Officer Shupe testified that Mr. Diggs threw down a cellphone and a cigar, took a defensive position, looked around and stepped backwards. Believing that Mr. Diggs might have a firearm, Officer Shupe grabbed Mr. Diggs' arm to check for weapons. A struggle ensued with two other WPD officers assisting and Officer Shupe found a gun in Mr. Diggs' waistband area.

Mr. Diggs filed the Motion to suppress the gun found on his person arguing that Officer Shupe lacked sufficient reasonable articulable suspicion to "seize" Mr. Diggs because: (i) the citizen providing information to Corporal Marino did not provide detailed enough information; (ii) the citizen's information was relayed to Corporal Marino and not Officer Shupe; (iii) Officer Shupe did not observe Mr. Diggs engage in any suspicious activity prior to engaging him in the Market.

The State opposes the Motion. The State claims that: (i) Officer Shupe's initial encounter with Mr. Diggs did not amount to a seizure; and (ii) Officer Shupe seized Mr. Diggs based on the tip of the citizen, his own observations and due to the high crime area where the encounter took

2

place.  The State contends that the totality of the circumstance created reasonable articulable suspicion that Mr. Diggs was carrying a concealed deadly weapon.

The Court held the Hearing on March 29, 2019 and April 1, 2019.  Six persons testified at the Hearing.  Corporal Marino and Officer Shupe testified for the State and were cross-examined by Mr. Diggs' counsel.  Mr. Diggs presented as witnesses: (i) Guy Bullock; (ii) Andrea Price; (iii) Na'Isha Pantoja; and (iv) Julia Pantoja.  The State had the opportunity to cross-examine each of Mr. Diggs' witnesses.  All the witnesses, except Corporal Marino, were at the Market on October 26, 2018.

Corporal Marino is a WPD officer with 12 years of experience.  On October 26, 2018, Corporal Marino was off-duty.  Corporal Marino received a call from a person he has known for 11 years.  Corporal Marino did not describe this person as a confidential informant.  Instead, Corporal Marino stated the person was a citizen who had provided Corporal Marino with information on various crimes on five occasions.  The name of the citizen was not provided at the Hearing.  Corporal Marino testified that the citizen's information was factually reliable and held lead to arrests.  Corporal Marino knows where the citizen lives, and stated that this citizen had never received any compensation (money, dropped charges, etc.) in exchange for any information provided.

Corporal Marino provided that, on October 26, 2018, the citizen called and told him that a black male, age 30-35 and wearing a camouflaged jacket had a handgun in his waistband.  Corporal Marino testified that the citizen also provided that the black male was going into a store located at the corner of S. Harrison and Chestnut Street.  Corporal Marino immediately relayed

---

[1] Unless otherwise noted, the facts in this section are from the Hearing.

the information to a WPD officer, Officer Shupe, who was on-duty on October 26, 2018. Corporal Marino testified that it was standard operating procedure for an off-duty officer to relay this type of information to an on-duty officer.

Corporal Marino stated that the location of S. Harrison and Elm Streets was the 200 block of S. Harrison. Corporal Marino said that this particular block was a high crime rate neighborhood that had recently experienced a shooting and an incident involving "Molotov Cocktails."

Corporal Marino did not keep any messages or phone log from October 26, 2018. Corporal Marino testified that he bought a new phone and no longer had the old phone which was wiped as part of the upgrade.

Officer Shupe is a WPD officer with 2.5 years of experience. Officer Shupe was on-duty on October 26, 2019. Officer Shupe discussed his training, including his training on how to identify a person armed with a gun—checking to see if the gun is secured, non-swinging arm on side where gun is located, type of walk, etc. Officer Shupe also testified about the ready position when drawing a fire arm with the hands up at chest level as opposed to one's side.

On October 26, 2018, Officer Shupe was in uniform and patrolling in a "fully marked" car with Officer Agusto. Officer Shupe received a call from Corporal Marino. Officer Shupe testified that Corporal Marino reported that a reliable source told him that a black male, age 30-35 in a camouflaged jacket had a handgun in his waistband on the 200 block of S. Harrison Street, specifically on the corner of Chestnut Street and S. Harrison Street. Officer Shupe noted that the 200 block of S. Harrison Street is a high crime area that recently experienced a shooting incident.

4

Officer Shupe proceeded to the area. When Officer Shupe arrived, he saw four to five black males walking up the 200 block of S. Harrison Street in the direction away from Chestnut Street and towards Elm Street. Officer Shupe testified that he saw that one of the black males matched the description provided to him by Corporal Marino. Officer Shupe noted that the individual entered the Market on the corner of S. Harrison Street and Elm Street. Due to the report of a handgun, Officer Shupe called and waited for additional WPD officers to arrive. Once Officers Jordan and Gaskin arrived, Officer Shupe got out of his car and approached the Market. As Officer Shupe entered the Market, he immediately encountered the black male, age 30-35 and wearing the camouflaged jacket who was leaving the Market. Officer Shupe testified that he later learned this person was Mr. Diggs.

Upon encountering Mr. Diggs, Officer Shupe stated that he asked to speak with Mr. Diggs as part of a casual encounter. Officer Shupe testified that Mr. Diggs threw down a cellphone and cigar that he was holding and assumed a defensive position with arms raised to chest level. Mr. Diggs then took steps backward while looking around. Mr. Diggs faced Officer Shupe during this initial encounter. Officer Shupe stated that this was the first time he had approached a person to talk to him/her and the person acted in this manner. Based on this and the information he had from Corporal Marino, Officer Shupe testified that he believed that Mr. Diggs had a firearm. As such, Officer Shupe grabbed Mr. Diggs' arm and tried to check for weapons. Officer Shupe said a struggle ensued in the Market and that Officers Jordan and Agusto joined in to secure Mr. Diggs. As this was happening, Officer Shupe found a loaded handgun in Mr. Diggs' pants. Officer Shupe testified that Mr. Diggs told him that "I need it for protection…I've been shot before."

5

After the arrest, Officer Shupe asked a person for the footage from a camera located in the Market. Officer Shupe was told by a person working at the Market that he did not know how to retrieve the footage. At a later date, Officer Shupe went back and tried again to retrieve the footage but, once again, was told that no one could retrieve the footage and give it to him.

At the Hearing, Officer Shupe stated that no one else in the Market was wearing a camouflaged jacket. Officer Shupe felt the store was not overly busy and that he only remembered one other customer—a woman in a red shirt.

On cross-examination, Officer Shupe provided that he did not know of Corporal Marino's relationship with the citizen. Officer Shupe stated that he did not know the citizen other than from the phone call with Corporal Marino and was not concerned with the reliability of the citizen. Officer Shupe admitted that he did not mention the cigar at the preliminary hearing and did not demonstrate, as he did at the Hearing, the defensive stance taken by Mr. Diggs at the preliminary hearing. Officer Shupe testified that he did not keep any call log or text messages from October 26, 2018 as he has to use his personal phone and that he needs to erase items for memory reasons.

Mr. Bullock is a cook at the Market. Mr. Bullock was working at the Market on October 26, 2018. Mr. Bullock stated that it was unusually hectic that night and that the store was crowded. Mr. Bullock was talking to children, at the request of the manager, by an ice cream machine in the front when Officer Shupe encountered Mr. Diggs. Mr. Bullock saw Officer Shupe grab Mr. Diggs but did not see Mr. Diggs throw anything to the ground before Officer Shupe grabbed him. Mr. Bullock said everything happened very quickly. Mr. Bullock thought that the officer that grabbed Mr. Diggs looked white but that it happened so quickly he could not be sure. Mr. Bullock said a number of officers were involved. Mr. Bullock noted that his focus

6

was on the children. Mr. Bullock said he did not really know Mr. Diggs other than his name. Mr. Bullock stated that he saw Mr. Diggs at least once a day for over a year when Mr. Diggs came in and purchased a certain type of sandwich but never really talked to Mr. Diggs.

Ms. Pierce is a neighborhood resident, living across the street from the Market. Ms. Pierce was in the Market on October 26, 2018. Ms. Pierce was behind Mr. Diggs when Officer Shupe arrived. Ms. Pierce is 10 inches shorter than Mr. Diggs. Ms. Pierce said she saw officers grabbing at Mr. Diggs and that Mr. Diggs tried to get away with his hands up. Ms. Pierce stated that everything happened very quickly. Ms. Pierce did not see Mr. Diggs throw anything to the ground and that the incident took place in the narrow entryway to the Market—half in and out of the storefront. Ms. Pierce knows Mr. Diggs from a friend of her mother.

Ms. Na'Isha Pantoja is the sister of Mr. Diggs. Na'Isha was outside the Market on October 26, 2018. Na'Isha saw the WPD officers approach the store. She noted that there was another black male wearing a camouflaged jacket that the officers did not stop. Na'Isha said that this black male was younger, "in his twenties." Na'Isha testified that the encounter between WPD and Mr. Diggs happened first at the door and that Mr. Diggs was wrestled to the ground outside the Market. Na'Isha said the officers searched Mr. Diggs between 20 to 30 times. On cross-examination, Na'Isha stated that she took video of the incident, but that the phone somehow deleted the "front end" and the "back end" of the incident but retained the middle portion of the event. No part of the video was played at the Hearing.

Na'Isha stated that she has dinner with Mr. Diggs "maybe" four times a week. Despite having dinner with Mr. Diggs on a regular basis, Na'Isha testified that she has never discussed the October 26 incident with her brother.

Ms. Julia Pantoja is Mr. Diggs' mother.  Julia was outside the Market on October 26, 2018.  Ms. Pantoja also testified that there was another younger black male wearing a camouflaged jacket that was not stopped by WPD officers.  Julia said that six to seven officers approached.  Julia said the officers grabbed Mr. Diggs and searched him six to seven times, including several times with respect to his pants.  Julia stated that Mr. Diggs is part of a close family and that she has talked to him briefly about the October 26 incident between three and four times.

**ANALYSIS**

The State bears the burden of proof on a motion to suppress a warrantless search or seizure.[2]  The State must demonstrate, by a preponderance of the evidence, that the challenged police action comported with the defendant's rights guaranteed under the United States and Delaware Constitutions.[3]

The Fourth Amendment to the United States Constitution and Article 1, § 6 of the Delaware Constitution prohibit unreasonable searches and seizures.[4]  The Delaware Supreme Court has held that a person is seized only if, under the totality of the circumstances, a reasonable person in the same position would not feel free to "go about his business" or "ignore the police presence."[5]

As the fact finder here, the Court is the judge as to the credibility of each witness and of the weight to be given to the testimony of each.[6]  The Court is taking into consideration each witness's means of knowledge, strength of memory and opportunity for observation. The Court

---

[2] *Hunter v. State*, 783 A.2d 558, 560-61 (Del. 2001).
[3] *Id*.
[4] *Harris v. State*, 806 A.2d 119, 124 (Del. 2002).
[5] *Flonnory v. State*, 805 A.2d 854, 857 (Del. 2001).
[6] *See Dunlap v. State*, 812 A.2d 899 (Del. 2002)(table); *see also Poon v. State*, 880 A.2d 236, 238 (Del. 2003).

will also consider the reasonableness or unreasonableness of the testimony and whether it is consistent or inconsistent. The Court will consider the motivations of the witness, whether the testimony has been contradicted, the bias, prejudice or interest of the witness, the demeanor of the witness upon the witness stand, and all other facts and circumstances shown by the evidence that affect the credibility of the testimony.

The Court does find that some of the testimony at the Hearing was conflicting by reason of inconsistencies. As such, the Court has the duty to reconcile it, if reasonably possible, so as to make one harmonious story of it all. Even with the inconsistencies, the Court finds that it can reconcile the inconsistencies to make one harmonious story of it all. Moreover, a number of the inconsistencies—number of searches, and alike—are not relevant to the Court's ultimate conclusion.

The Court finds that Officer Shupe seized Mr. Diggs at the time he grabbed Mr. Diggs' arm. At this point in time, a reasonable person in the same or similar situation would not have felt free to go about his/her business. Therefore, the Court will focus on whether Officer Shupe had reasonable suspicion at the time he grabbed Mr. Diggs' arm.

Police officers may seize or detain an individual for a limited investigation if the "officer ha[s] a particularized and objective basis to suspect"[7] that the individual "is committing, has committed, or is about to commit a crime."[8] Delaware codified this reasonable suspicion standard in 11 *Del. C.* § 1902. This Court has explained that reasonable suspicion is evaluated by the totality of the circumstances "as viewed through the eyes of a reasonable, trained police

---

[7] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1288 (Del. 2008).
[8] *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001).

9

officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[9]

Section 1903 of Title 11 provides that:

A peace officer may search for a dangerous weapon any person whom the officer has stopped or detained to question as provided in § 1902 of this title, whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon. If the officer finds a weapon, the officer may take and keep it until the completion of the questioning, when the officer shall either return it or arrest the person. The arrest may be for the illegal possession of the weapon.[10]

The United States Supreme Court recognized, in *Terry v. Ohio,*[11] that a policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a limited protective search for concealed weapons.[12]

The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.  As such, the limited search for a weapon might be equally necessary and reasonable whether or not carrying a concealed weapon violated any applicable state law.  As stated in *Nash v. State*, if an officer is entitled to make a stop or a detention to question and has reason to believe that the suspect is armed and dangerous, then the officer may conduct a weapons search limited in scope to this protective purpose.[13]  Actual fear by the police officer for his or

---

[9] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).
[10] 11 *Del. C.* § 1903
[11] 392 U.S. 1 (1968).
[12] *Id*. at 26; *see also Adams v. Williams*, 407 U.S. 143 (1972).
[13] *Nash v. State*, 295 A.2d. 715, 717 (Del. 1972).

her own safety is not a prerequisite to the reasonableness of the limited search for weapons.[14]

The Supreme Court has held that certain anonymous tips lack enough reasonable suspicion to allow an officer to perform an investigatory stop. [15] The Supreme Court has also held that a prior basis for establishing the informant's reliability is unnecessary "in the case of an average law abiding citizen performing a civic duty by reporting a crime. Indeed, a citizen informant 'is a passive observer with no connection with the underworld, and no reason to fabricate what he has seen or heard, and as such is considered presumptively reliable.'"[16] In fact, in the case of an average law-abiding citizen doing her civic duty by reporting a crime, the mere revelation of identity and reporting of criminal activity by the citizen may be enough to constitute probable cause.[17]

The Court finds from the facts presented at the Hearing that Corporal Marino's citizen falls into the category of "citizen informant." Mr. Diggs attempts to have this citizen characterized as a "confidential informant;" however, the record demonstrates that the citizen informant was not a member of the criminal community, but rather an individual who occasionally telephoned police to report incidents of which he or she had knowledge. Corporal Marino's testimony that his caller was a citizen who never received compensation (money, dropped charges, etc.) for relayed information support the finding that the caller was a citizen informant.

---

[14] *Id*. at 718.

[15] *Guilfoil v. State,* 3 A.3d 1097 (Del. 2010)(table)(quoting *Bloomingdale v. State*, 842 A.2d 1212, 1219 (Del. 2004)) (internal quotations omitted).

[16] *Baily v. State*, 440 A.2d 997, 999 (Del. 1982)(quoting from *Harris v. State*, 416 A.2d 189, 202 (Del. 1980)); *see also Wilson v. State*, 314 A.2d 905, 907-08 (Del. 1973).

[17] *See Wilson*, 314 A.2d at 907.

Moreover, an informant's tip (whether from a citizen or another type of informant) can be corroborated externally.[18]  While that may not be as necessary in a case involving a citizen informant, such is the case here.  Corporal Marino relayed that he had facts from a reliable source that a black male, age 30-35, wearing a camouflaged jacket and having a firearm in his waistband was entering a store on the corner of Chestnut and S. Harrison Streets.[19]  When Officer Shupe arrived shortly afterwards, Officer Shupe saw a person matching that description on the same block, walking away from Chestnut Street and eventually entering the Market.  The description was specific enough that the evidence demonstrates that WPD officers, including Officer Shupe, did not even stop and question another black male wearing a similar jacket.  Instead, Officer Shupe went into the Market to talk to Mr. Diggs.

Mr. Diggs contends that Officer Shupe did not testify that he saw any indicia of gun possession by Mr. Diggs—altered gait, checking for a weapon as one walks, etc.  While more corroboration is necessarily better, the Court does not find this fatal to the reasonable suspicion analysis given the source of the information, Mr. Diggs' location on the same block as first reported, and the spot-on description of Mr. Diggs' age, race and apparel.

The Court finds that Officer Shupe had a particularized and objective basis to suspect that Mr. Diggs was committing a crime—possible possession of a firearm without a license or, if hidden, carrying a concealed deadly weapon.  Given that reasonable articulable suspicion

---

[18] *See, e.g., Garner v. State*, 314 A.2d 908 (Del. 1973).

[19] At the Hearing, Mr. Diggs seemingly contended that the fact that Corporal Marino talked to the citizen informant and relayed the information to Officer Shupe somehow negatively impacted the credibility of the information provided by the citizen informant.  Delaware courts have held that an arresting officer is entitled to rely on information relayed to him through official channels and that the arresting officer need not be apprised of the underlying circumstances which gave rise to the conclusion of probable cause.  *See Thomas v. State*, 8 A.3d 1195, 1198 (Del. 2010); *State v. Cooley*, 457 A.2d 352, 355 (Del. 1983)(officer can act in the belief that his fellow officer's judgment is correct).  While Officer Shupe did not receive the information from WPD dispatch, Officer Shupe received the call from a superior officer, Corporal Marino, who had been working in the area for many years. In addition, Corporal Marino testified that it was "standard operating procedure" for an off-duty officer to relay the information to an on-duty officer.

12

supported the stop, the inquiry shifts as to whether Officer Shupe could frisk Mr. Diggs to determine whether Mr. Diggs had a weapon.

The witnesses testifying at the hearing give various accounts of what happened at the entrance of the Market. The relevant inconsistencies in testimony relate to the interaction between Mr. Diggs and Officer Shupe prior to Officer Shupe grabbing Mr. Diggs. The Court understands from all of the testimony that the encounter between Officer Shupe and Mr. Diggs happened fast over a few seconds.[20] In addition, given the narrow aisles at the Market, no witness at the Hearing had a clear view of the face to face interaction between Officer Shupe and Mr. Diggs other than Officer Shupe. Mr. Bullock was behind Mr. Diggs and, at the request of management, talking to some boys in the shop. Ms. Pierce was also behind Mr. Diggs. Although not dealing with customers like Mr. Bullock, Ms. Pierce is 10 inches shorter than Mr. Diggs and necessarily had her view of the face-to-face encounter between Officer Shupe and Mr. Diggs blocked by Mr. Diggs. Na'Isha and Julie Pantoja were outside the Market and were restricted in their view of the encounter by Officer Shupe and the additional WPD officers at the scene. Under these circumstances, the Court would expect the testimony to differ as to what exactly happened between Officer Shupe and Mr. Diggs.

Officer Shupe was in an area that had recently experienced a shooting and an incident involving Molotov cocktails. The citizen informant provided that Mr. Diggs had a concealed firearm. According to Officer Shupe, Officer Shupe tried to talk to Mr. Diggs but, after asking to speak with him, Mr. Diggs reacted in a manner that Officer Shupe had never seen before. Mr. Diggs threw down the items in his hands, got into a defensive position and took steps backwards. At this point, Officer Shupe believed that Mr. Diggs had a gun and grabbed him to check for

---

[20] Every witness testified that the event happened quickly. This probably lead to inconsistencies about the location where the encounter occurred, the number officers on the scene and alike.

weapons. A struggle ensued, other WPD officers joined in and a loaded handgun was found in Mr. Diggs' waistband.

The Court finds that Officer Shupe was justified in believing that Mr. Diggs, whose suspicious behavior he was investigating at close range, was armed and presently dangerous to Officer Shupe or others. Officer Shupe was a policeman making a reasonable investigatory stop in a situation where reliable information supported the conclusion that Mr. Diggs may be armed with a handgun. Officer Shupe, therefore, should not be denied the opportunity to protect himself from possible attack when faced with situation involving suspicious behavior. Accordingly, the Court finds that Officer Shupe did not violate Mr. Diggs' constitutional rights when Officer Shupe attempted to conduct a limited protective search for concealed weapons.[21]

### CONCLUSION

For the above reasons, the Court finds that there was reasonable suspicion to stop Mr. Diggs based on the information provided to Corporal Marino by the citizen informant and relayed to Officer Shupe. The conduct of Mr. Diggs subsequent to Officer Shupe approaching him demonstrated to Officer Shupe that Mr. Diggs might be armed and presently dangerous. As such, Officer Shupe was justified in his attempts to conduct a limited protective search for concealed weapons.

 **IT IS HEREBY ORDERED** that the Motion is **DENIED.**

Dated: April 16, 2019
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge

---

[21] The Court is using the word "attempted" here because the seizure by Officer Shupe escalated due to resistance by Mr. Diggs and the limited protective search required intervention by other WPD officers.

14