**Alma JARVIS, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Sept. 17, 1991.
Decided: Oct. 30, 1991.

Anthony A. Figliola, Jr. (argued), Figliola & Facciolo, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., Dept. of Justice, Wilmington, for appellee.

Before CHRISTIE, C.J., and WALSH and HOLLAND, JJ.

WALSH, Justice:

In this case, we are asked to determine whether the Superior Court properly admitted evidence obtained from the stop, search, and seizure of appellant, Alma Jarvis ("Jarvis"). We hold that reasonable suspicion existed for the initial stop and that, during the stop, this suspicion blossomed into full probable cause to arrest. We therefore affirm the Superior Court's refusal to suppress evidence of illegal drugs found on Jarvis' person during a search incident to that arrest.

I

This case arises out of the efforts of Delaware police agencies to interdict the flow of drugs from an area of Philadelphia known as Aramingo Avenue. According to the evidence presented by the State, the Aramingo Avenue area in North Philadelphia is known to local law enforcement officials as a "drug supermarket." Physically, the area is ghetto-like, with burned out buildings, abandoned automobiles, and trash strewn streets. Drugs are purveyed openly on the streets in a bazaar atmosphere. In the words of one officer who testified:

> [t]here are a large number of street dealers and people who will wave you over, approach you, for the purpose of selling drugs, cocaine, marijuana, whatever it is you want. These people freely go walk the streets [sic] yelling out, "Halves, quarters; I can get you pounds of marijuana," whatever it is you want.

According to the same witness, only small purchases are consummated in the open. When one wishes to purchase a large quantity, a prospective purchaser enters a house or building in the area to complete the transaction.

To stem the flow of drugs from this area, various law enforcement officials, in conjunction with federal authorities, determined to set up surveillance teams to observe transactions and follow the purchasers into Delaware and Maryland where arrests would be made. During Jarvis' trial, Detective Jose Hernandez of the New Castle County Police testified that, as of the

date of Jarvis' arrest, the surveillance teams had completed six operations which had resulted in eighty-five arrests. When asked if the teams had ever *not* found drugs in a car with a Delaware license plate stopped after coming from Aramingo Avenue, he answered that they had not. In sum, at the time Jarvis was arrested, every car with a Delaware license plate stopped after coming from Aramingo Avenue, and whose occupants had been observed engaging in activity commensurate with drug dealing in that area, was found to be carrying illegal drugs.

On November 21, 1988, Hernandez and another officer were operating as a surveillance team ("the team"). The team spotted a white Camaro with a Delaware license entering the Aramingo area. The Camaro parked in a lot near a deserted factory and three people emerged—Alma Jarvis and two male companions. The trio walked around the block onto Phillips Street. The officers noted immediately that there was available parking space on Phillips Street yet Jarvis and her companions had chosen to park in a much less conspicuous area.

While walking along Phillips Street, they met an individual described as an Hispanic male. The three spoke with the Hispanic male for a few moments then followed him to a house located in the 2900 block of Phillips Street. The Hispanic male knocked on the door, the door opened and all four entered. Again, members of the team noticed that there was parking available directly in front of the house.

Approximately ten minutes later, Jarvis and her two original companions emerged from the house. They walked directly to their vehicle, left the Aramingo Avenue area and headed south on I–95, towards Delaware. The surveillance team followed in unmarked cars, never losing sight of the Camaro.

At the radioed direction of the surveillance team, a uniformed police officer in a marked car stopped the Camaro just inside the Delaware border. Jarvis was a passenger in the back seat while the two males, including the driver, were in the front seat. The team also pulled over and took part in the stop. The occupants were asked to step out of the car and were patted down for weapons. This pat down search produced a clear plastic bag containing a white powder, found in the pocket of one of Jarvis' companions. The three were immediately arrested.

Because it was necessary for a female police officer to search Jarvis, the police did not do so until she had been taken back to the station and read her *Miranda* rights. The search revealed various caches of marijuana found on Jarvis' person and in her handbag. Moreover, Jarvis made a number of incriminating statements during the search.

Following her indictment, Jarvis moved to suppress any evidence of drugs found on her person on the ground that the stop of the automobile and her subsequent seizure and arrest were violative of her constitutional rights against unreasonable search and seizure. The Superior Court rejected this claim, ruling that the police through their surveillance operation had developed probable cause to seize the Camaro and its occupants. Jarvis was subsequently convicted and sentenced to imprisonment.

II

Jarvis makes but one claim on appeal. She contends that the surveillance team lacked the requisite justification to stop the vehicle in which she was riding. It is her position that the stop and arrest were unreasonable under the Fourth Amendment to the United States Constitution and under Article 1, Section 6 of the Delaware Constitution. If she is successful on this claim, all the evidence against her obtained from the search, as well as the statements made at the police station, would be inadmissible, requiring her convictions to be reversed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Because this is a pure question of law, we review the Superior Court's determination *de novo*, *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927 (1982), and find Jarvis' contention to be without merit.

■ Jarvis' arguments in this Court are devoted entirely to the issues of whether probable cause and/or exigent circumstances existed for the stop, thus bringing the case within the automobile exception to the warrant requirement. *See Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). We find it unnecessary to address those issues directly since we conclude that the surveillance team clearly had reasonable suspicion to stop Jarvis and this suspicion blossomed into full probable cause to arrest during the stop.[1]

Perhaps the most important exception to the warrant requirement of the Fourth Amendment is the so-called "Terry stop." In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a limited seizure of an individual along with a limited search for weapons was constitutionally permissible even in the absence of a warrant or probable cause. All that is required of the police is a reasonable suspicion of wrongdoing based on articulable facts and rational inferences. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. The holding rested on the notions that police require flexibility when dealing with the myriad situations arising in the course of everyday police work and that the limited nature of the intrusion justifies the lesser showing of suspicion required.[2] *Id.*, 392 U.S. at 20, 88 S.Ct. at 1879.

We need not delve into the finer points of the *Terry* standard. Nor need we indulge in an elaborate application of the standard to the facts of this case for Jarvis has conceded that the police possessed reasonable suspicion. However, the facts supporting reasonable suspicion also contribute to the probable cause which emerged during the stop. It is not amiss, therefore, to examine the extent to which the surveillance team's information supported its suspicions.

■ As previously noted, the surveillance team observed an out-of-state vehicle park in a deserted area near a neighborhood known for drug trafficking. The occupants met an individual on the street who took them to a house in which they stayed no more than ten minutes. They then returned to their automobile and left immediately.

It must be admitted that these actions, even when viewed together, are subject to a variety of innocent explanations. Still, given the known reputation of the area, they are also clearly compatible with an effort to purchase drugs. While open to a variety of meanings, the observed activities tracked the pattern for drug purchasing in

1. Technically speaking, Jarvis, as a mere passenger, has no standing to object to the stop of the vehicle. There is evidence in the record that she did not own the vehicle nor did she exercise control over it. She therefore had no reasonable expectation of privacy in the vehicle, *per se*, and, under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), cannot object to its seizure by the police. *See Government of the Virgin Islands v. Williams*, 3d Cir., 739 F.2d 936 (1984). However, we doubt she would have been free to leave once the Camaro had been stopped since she was herself detained. We thus assume she has standing to object to the circumstances under which her person was seized. *See Florida v. Royer*, 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983).

2. In her brief, Jarvis seems to assume that the exception to the warrant requirement carved out in *Terry* is inapplicable to automobiles. Instead, she relies on a prior decision by this Court, *Freeman v. State*, Del.Supr., 317 A.2d 540 (1974), in support of the proposition that probable cause did not exist at the time the Camaro was stopped. While factually similar to the case at bar, *Freeman* is inapposite. In that case, we held the police lacked probable cause for the search and seizure of Freeman's vehicle. Reasonable suspicion was neither argued nor ruled upon as a basis for the stop. Here, we review the propriety of the stop on reasonable suspicion grounds and do not reach the question of whether the police possessed probable cause at the time of the stop. Accordingly, *Freeman* continues to represent a proper statement of the law when confined to its facts. Suspicion is no more a substitute for probable cause than a *Terry* stop is for a full search or seizure. Any stop by the police supported only by reasonable suspicion is still subject to the limitations set out in *Terry*. Once the police go beyond those limits, they still have the burden of producing a valid warrant or showing that some other exception to the warrant requirement applies. Thus, for example, if the police had conducted a full search of Jarvis before probable cause to believe she possessed illegal drugs developed, that search clearly would have been unreasonable under the Fourth Amendment.

the Aramingo Avenue area. Thus, arguably, the observed conduct alone would be enough to supply reasonable suspicion. Indeed, *Terry* itself seems to have been decided on less. There, all the officer observed was two individuals continually walking up a street, peering in a particular shop window, walking back down the street and conferring. 392 U.S. at 6, 88 S.Ct. at 1872. This activity was held to support a reasonable suspicion because it was typical of behavior engaged in in order to "case" an intended robbery target. In fact, the Supreme Court in *Terry* went even further by noting that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." 392 U.S. at 23, 88 S.Ct. at 1881.

But here there is more. Not only was the observed activity compatible with what the officers knew to be the customary procedure for buying drugs in the area, but that activity had led them to illegal drugs every time it had been investigated. This "profile" of activity had directed them to eighty-five arrests in six operations. It had never been shown to be indicative of anything but drug trafficking up to that period in time. There comes a point where a certain sequence of events or concurrence of facts accompanies a particular conclusion so often that it leaves the realm of coincidence and enters the world of police experience. On such experience, the police are entitled to rely. Cf. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).[3]

In this case, the police suspected Jarvis and her companions of buying drugs based on their observations, their experience and inferences drawn from both. This was clearly more than a hunch. This was a reasonable suspicion based on articulable facts and rational inferences. The team was not certain Jarvis carried drugs when they stopped the car in which she was a passenger, but they were not required to be. She was present at all times during the suspicious transactions and, based on their beliefs at the time, the team had ample justification to stop the Camaro and its passengers.

■ This conclusion, of course, does not settle the matter. Jarvis was seized during the stop and subjected to a full search at the police station. The search can be justified as a search incident to an arrest, but only if the arrest, or seizure, was lawful. *United States v. Edwards*, 415 U.S. 800, 802, 94 S.Ct. 1234, 1236, 39 L.Ed.2d 771 (1974). While reasonable suspicion will support a limited search and seizure, it does not justify an arrest. Only probable cause provides the police the authority to intrude into an individual's privacy to that extent. *See* 11 *Del.C.* § 1904(b)(1); *Thompson v. State*, Del.Supr., 539 A.2d 1052 (1988).[4] We must therefore determine whether the police had probable cause at the time Alma Jarvis was arrested.

At the time the Camaro was stopped, the team had some fairly precise suspicions. They believed the trio had come to Aramingo Avenue to purchase drugs, had met a dealer on the street, had accompanied him to a house where they consummated a bulk transaction and were then returning home with the newly acquired drugs. To turn these suspicions into probable cause, the police were required to uncover additional

---

3. It is true that the Supreme Court in *Royer* did not explicitly endorse the use of drug courier profiles or any type of "profile." However, the plurality did find a stop based, in part, on such a profile to be valid. 460 U.S. at 502, 103 S.Ct. at 1326. And the dissenters explicitly affirmed the use of such profiles. 460 U.S. at 525 n. 6, 103 S.Ct. at 1339 n. 6 (Rehnquist, J. dissenting). In fact, only Justice Brennan would have found the stop in *Royer* to be unconstitutional. 460 U.S. at 509, 103 S.Ct. at 1330. (Brennan, J. concurring). It is fair to say, then, that at least eight members of the United States Supreme Court supported the use of drug courier profiles by police when making reasonable suspicion determinations.

4. The Delaware warrantless arrest statute provides that, before the police may arrest an individual for a felony, they must have "reasonable grounds to believe that the person to be arrested has committed a felony." 11 *Del.C.* § 1904(b)(1). In *Thompson*, we held that the phrase "reasonable grounds to believe" is the legal equivalent of "probable cause." 539 A.2d at 1055.

 

information which suggested, when viewed in the totality of the circumstances, that there was a fair probability that their suspicions were correct. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). They need not have found evidence which would have proved those suspicions beyond a reasonable doubt or even made them more likely true than not. But they needed more than mere reasonable suspicion. *State v. Cochran,* Del.Supr., 372 A.2d 193, 195 (1977).

We believe the police found that requisite evidence when they discovered the clear plastic bag containing white powder in the pocket of Jarvis' companion. Both Jarvis and her companion had been observed participating in suspicious activity. They travelled to and left Aramingo Avenue together. They met the same individual on the street and, with that individual, they both entered a house in which the police reasonably suspected a drug deal to have occurred. The police then found what was almost certainly a controlled substance on one of them.[5] With such an identity of circumstances, the police were justified in concluding that a fair probability existed that the one remaining element—possession of narcotics—also existed. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).[6] We therefore find that the police did have probable cause to arrest Jarvis at the time the bag of white powder was found on her companion.

### III

In conclusion, based on their observations, their experience and rational inferences drawn therefrom, the police had sufficient justification to stop the automobile in which Alma Jarvis was riding. During the brief detention which ensued, the suspicions of the police matured into full probable cause to arrest. The evidentiary product of the subsequent search of Jarvis and the statements made by her were therefore admissible against her.

The decision of the Superior Court is AFFIRMED.

---

**5.** We note that Jarvis has no standing to object to the admissibility of the white powder (which turned out to be cocaine) based on the search of her companion's pocket. There is no evidence to suggest, and she does not assert, that she had a reasonable expectation of privacy in her companion's pocket. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

**6.** In *Ker,* the police purchased a quantity of marijuana from one Murphy, a known drug dealer. The purchase entailed a particular procedure for delivery of the drugs. On the following evening, the police observed Murphy go through this same procedure with Ker. Prior to this, the police had been told by a reliable informant that Ker was also a dealer whose source of supply was a man named Murphy. The Supreme Court concluded that this information provided the police with probable cause to arrest. 374 U.S. at 35, 83 S.Ct. at 1630.