IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANZARA BROWN, | § | |
| | § | No. 603, 2013 |
| Defendant Below/Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware, |
| | § | in and for Kent County |
| STATE OF DELAWARE, | § | |
| | § | Criminal ID No. 54840995 |
| Plaintiff Below/Appellee. | § | |

Submitted: June 17, 2015
Decided: June 17, 2015

Before **STRINE**, Chief Justice; **HOLLAND** and **VALIHURA**, Justices.


Upon appeal from the Superior Court. **AFFIRMED**.


Sandra W. Dean, Esquire, Camden, Delaware, for Appellant.


Kathryn J. Garrison, Deputy Attorney General, Department of Justice, Georgetown, Delaware, for Appellee.



**STRINE**, Chief Justice:

## I. INTRODUCTION

Anzara Brown was convicted on various charges of drug dealing and drug possession following a jury trial in the Superior Court. In his direct appeal to this Court, Brown challenged three decisions of the Superior Court regarding the admissibility of certain evidence used against him at trial. Because we find that the Superior Court acted within its discretion to deny Brown's suppression motions and admit the evidence, we affirm his judgment of convictions.

At oral argument on Brown's appeal to this Court, his counsel informed the Court for the first time that James Woodson, the courier for the Office of the Chief Medical Examiner ("OCME") who handled the drug evidence seized from Brown following his arrest, had been indicted for alleged improprieties, including the theft of drug evidence for personal use. Woodson's indictment resulted from a larger investigation into evidence mishandling at OCME. This Court stayed Brown's appeal and remanded the case to permit him to file a motion for a new trial, given the new evidence of Woodson's alleged misconduct. On remand, the Superior Court denied Brown's motion, finding that the newly discovered facts would probably not have changed the results in his case. The matter was then returned from remand, and the parties filed supplemental briefs.

We conclude that the Superior Court was within its discretion to deny Brown's motion for a new trial. Although sloppy evidence-handling practices and potentially worse behavior by OCME employees is disappointing and regrettable, there is no rational basis to infer that any sloppiness or other improprieties at OCME resulted in any injustice to Brown. Brown admits that he possessed cocaine in more than sufficient amount to

1

justify his convictions, and there was overwhelming evidence of his guilt separate from the drugs seized from him. Accordingly, we affirm the Superior Court's denial of his motion for a new trial.

## II. FACTUAL BACKGROUND[1]

Brown's arrest resulted from an extensive police investigation into an alleged drug trafficking syndicate run by Galen Brooks.[2] In addition to using undercover purchasers and confidential informants, the police obtained a warrant to wiretap Brooks' cell phones, and conducted video surveillance of Brooks' house and physical surveillance of the entrance to his neighborhood. On May 31, 2012, officers listened to four calls in which Brooks and an unknown man arranged for the man to buy cocaine from Brooks. In the last call, which took place at 5:35 p.m., the man told Brooks that he would be at Brooks' house in approximately seven minutes to pick up the drugs. The officers listening to the telephone conversations, including Sergeant Lance Skinner of the Delaware State Police, relayed that information to the officers conducting surveillance. Sergeant Skinner then travelled to the area near Brooks' house to wait for the unknown man.

At the same time, Detective Jordan Miller of the Dover Police Department was conducting video surveillance of Brooks' house. Detective Miller watched another man, John Price, leave Brooks' home at 5:48 p.m.[3] The police were familiar with Price's voice and telephone number from the investigation and believed that Price was not the

---

[1] The undisputed facts are taken from the record at trial and on appeal.
[2] *See State v. Brooks*, 2013 WL 4051049 (Del. Super. July 30, 2013); *see also Ayers v. State*, 97 A.3d 1037, 1038 (Del. 2014) (affirming the convictions of another defendant involved in Brooks' syndicate).
[3] The record does not indicate the time that Price arrived at Brooks' house.

2

unknown man from the four telephone calls. Three minutes after Price left, or roughly sixteen minutes after the fourth phone call, an unknown woman and a man later identified as Anzara Brown arrived at Brooks' home. Brooks came out to meet them and they went around the side of the house, out of view of the camera. Approximately five minutes later, Brown and the woman left Brooks' home. Brooks himself left a minute later, indicating to the police that he was no longer waiting for the unknown man from the telephone call to arrive. Detective Miller informed the other officers involved with the investigation.

Sergeant Skinner followed Brown's vehicle in his patrol car for two to three miles after it left Brooks' house. Sergeant Skinner then stopped the vehicle and asked Brown to step outside on the pretext that there was a problem with his registration. Sergeant Skinner testified at Brown's trial that he recognized Brown's voice from the telephone calls earlier that day.[4] When Brown stepped out of his vehicle, Sergeant Skinner arrested him. He then conducted a pat-down search of Brown and found what he described as two bags of cocaine contained in a pouch in Brown's front pocket. One of the bags contained three smaller bags, for a total of five bags. Sergeant Skinner transported the drugs to the police station, where two other officers, Sergeant Jeremiah Lloyd and Master Corporal Jeffrey Lavere, field-tested and weighed the contents and sealed the bags to transport to the Office of the Chief Medical Examiner. According to Sergeant Skinner's testimony at trial, three of the bags contained crack, and one of the bags contained powder cocaine.[5]

---

[4] App. to Opening Br. at 66 (Trial Test. of Skinner, Sept. 9, 2013).
[5] *Id*. at 74.

There was also a small amount of powder cocaine in the bag that contained the three smaller bags. The Delaware State Police Evidence Report indicated that the bags together contained approximately 1.2 grams of powder and 20 grams of crack cocaine.[6]

Sergeant Skinner searched Brown again at the police station and found a small bag of marijuana and a pair of brass knuckles in Brown's pocket. In a statement to the police, Brown admitted that he had an ounce of cocaine (approximately 28 grams), and that he intended to sell it. He gave the police his cell phone number, which matched the one captured on the wiretap. After he was released, Brown was also recorded on a wiretap speaking on the phone with Brooks, describing his arrest and the seizure of the drugs, and assuring Brooks that he would not "fall short."[7]

Ultimately, fourteen defendants were indicted for their involvement in the drug syndicate, including Brooks and Brown.[8] Brown moved to sever his case from the other defendants, which the Superior Court granted. Brown also filed two pre-trial motions, one to suppress the evidence seized from him following his arrest and another to suppress the evidence from the wiretaps. The Superior Court denied both of those motions.

At Brown's trial, Sergeant Skinner, Sergeant Lloyd, and Master Corporal Lavere all testified about the cocaine seized from Brown. Despite the evidence report filed by Sergeant Lloyd and Master Corporal Lavere indicating that Sergeant Skinner had seized 1.2 grams of powder cocaine from Brown, Sergeant Skinner testified that he had collected 8 grams of powder cocaine from Brown, in addition to the three bags of crack

---

[6] Opening Br., Ex. F (Delaware State Police Evidence Report).
[7] *State v. Brown*, ID #1205025968A, at 5 (Del. Super. Dec. 18, 2014) (letter order).
[8] *See* App. to Opening Br. at 8-47 (Indictment by the Grand Jury).

cocaine.[9]  Patricia Phillips, the OCME forensic examiner responsible for testing the

cocaine seized from Brown, also testified at trial.  She stated that when she received the

envelope containing the drugs seized from Brown, the seal was intact and there was no

sign of tampering.  Phillips' report indicated that there were five bags of cocaine, but in

different quantities than the officers indicated: one bag of "white powder" containing

7.03 grams; one bag of "white powder" containing 0.67 grams; and three bags of an "off-

white chunky substance" containing approximately 15.53 grams.[10]

During Phillips' testimony, Brown objected to the admission of the cocaine

evidence.  He contended that the discrepancies between the Police Evidence Report and

the Medical Examiner's report suggested that there were concerns with the integrity of

the evidence, and thus its admissibility.[11]  In particular, Brown emphasized that the police

officers' account of which bags contained crack or powder did not match the Medical

Examiner's report.[12]  Brown's attorney requested that she be able to question Phillips

about the "transport from Troop 3 to the medical examiner's office."[13]  The Superior

Court denied that request, noting that 10 *Del. C.* § 4331 defines the chain of custody as

the "seizing officer, the packaging officer, and the medical examiner," all of whom had

testified at Brown's trial, which Brown's attorney conceded.[14]

---

[9] App. to Answering Br. at 143 (Trial Test. of Skinner, Sept. 9, 2013).

[10] App. to Supp. Opening Br. at 67 (Controlled Substances Laboratory Report).

[11] App. to Answering Br. at 173 (Tr. of Arguments, Sept. 10, 2013).

[12] *See* App. to Answering Br. at 161-63 (Tr. of Arguments, Sept. 10, 2013).

[13] *Id*. at 175.

[14] *Id*.  During oral argument before this Court, the State's attorney suggested that Brown requested to cross-examine James Woodson, the OCME courier who handled the drugs seized from Brown and who was later indicted for allegedly tampering with evidence.  *See* Oral Arg't Tr. (May 28, 2014), *available at* http://courts.delaware.gov/supreme/oralargs/video/2014-05-

In responding to Brown's objection, Phillips clarified in a sidebar with the Superior Court and both attorneys that her references to particular bags were not intended to correspond to the officers.[15]  The State pointed out that both reports described three bags of crack cocaine and one bag of powder cocaine, in addition to the outer bag, which contained a small amount of powder cocaine, although there were weight differences between the reports of powder and crack.[16]  Phillips also explained during the sidebar that "sometimes . . . powder . . . clumps together and it appears to be a chunky substance when it is more powdery. . . .  My description is that it's chunky.  That's not a clinical or chemical differentiation.  It is a description of how the evidence appears."[17]  She noted that because Delaware's drug laws do not differentiate between powder and crack cocaine, she did not specifically delineate the form of the cocaine beyond its appearance in her report.[18]  Phillips also explained that she did not weigh the drug packaging, which the State offered as an explanation for the discrepancy between the weight of the powder cocaine she testified to compared to Sergeant Skinner's testimony, even though the total amount of cocaine she reported (23.23 grams) was more than that reported by the police (21.2 grams).  The Superior Court determined that the drug evidence was admissible,

28_603,_2013_Brown_v_State_of_Delaware.mp4.  Based on the transcript of the trial in the record, though, it does not appear that Brown ever suggested that Woodson should testify.  *See* App. to Answering Br. at 175 (Tr. of Arguments, Sept. 10, 2013).  *Cf. Milligan v. State*, 2015 WL 3622880, at *4-5 (Del. June 10, 2015) (discussing the requirements to establish a chain of custody under Delaware and federal law, and observing that the U.S. Supreme Court held in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), that "not every individual who may have relevant testimony for the purpose of establishing chain of custody must appear in person as part of the prosecution's case").

[15] *See id.* at 170.
[16] *See id.* at 171-72.
[17] App. to Opening Br. at 167-68 (Tr. of Arguments, Sept. 10, 2013).
[18] *Id.* at 167.

noting that "I don't think there's any reasonable possibility that the drugs got mixed up with some other drugs that were not on [Brown's] person into those envelopes. . . ."[19]

Following a three day trial, Brown was convicted by the jury of one count each of drug dealing at Tier 4, aggravated possession of a controlled substance, carrying a concealed deadly weapon, possession of a deadly weapon during the commission of a felony, conspiracy in the second degree, criminal solicitation in the second degree, and possession of marijuana. The Superior Court sentenced Brown as a habitual offender to two life sentences for the charges of drug dealing and aggravated possession of a controlled substance. Brown was sentenced to a total of twenty-nine years and six months' imprisonment, suspended after 27 years, on the remaining charges.

### III.    PROCEDURAL HISTORY

#### A.    Brown's Direct Appeal

Brown appealed his convictions directly to this Court. In that appeal, Brown raised three claims: (1) that the trial court abused its discretion in admitting the evidence obtained as a result of the traffic stop; (2) that the trial court abused its discretion in admitting into evidence telephone calls that had been intercepted by the court-ordered wiretap; and (3) that the trial court abused its discretion by admitting cocaine into evidence when the State failed to establish an adequate chain of custody.

At oral argument, defense counsel informed the Court for the first time that the OCME courier who handled the cocaine seized from Brown, James Woodson, had been indicted and arrested on suspicion of improperly handling evidence. In light of his

---

[19] *Id*. at 178.

argument before the trial court and on appeal that there were discrepancies between the weight and type of cocaine reported by the packaging officer at the police station and by the Medical Examiner, Brown contended that the possibility that Woodson had tampered with the cocaine seized from Brown at least warranted a remand to the Superior Court to re-evaluate his arguments about the chain of custody. In response, this Court requested that counsel supplement the record to formally provide us with information about Woodson's indictment. The State complied by submitting a copy of the indictment, which alleged, among other counts, that Woodson had engaged in trafficking in cocaine, tampering with physical evidence, and official misconduct. At that point, only two OCME employees, Woodson and chemist Farnum Daneshgar,[20] had been accused of any misconduct.[21]

On June 9, 2014, this Court issued an order staying Brown's appeal and remanding the case to the Superior Court to permit Brown to file a motion for a new trial on the grounds of newly discovered evidence.[22] We ordered the Superior Court to issue periodic progress reports and retained jurisdiction.

---

[20] Daneshgar was not involved in testing the evidence seized from Brown.
[21] The Court takes judicial notice that James Woodson pled guilty on May 18, 2015, to official misconduct and providing criminal history record information to an unauthorized person. Farnam Daneshgar was tried by a jury on charges of possession of marijuana and possession of drug paraphernalia. The State dismissed those charges on May 1, 2015, after the jury failed to reach a unanimous verdict.
[22] We also ordered the Superior Court to correct errors in Browns' conviction and sentence that the State identified before oral argument. *See Brown v. State*, No. 603, 2013 (Del. June 9, 2014) (order).

## B.    Remand Following Oral Argument

The Superior Court denied Brown's motion for a new trial on December 18, 2014. Although the Superior Court agreed with Brown that the alleged improprieties by the OCME employees were "newly discovered" and more than "merely cumulative or impeaching," it determined that "the evidence was not of a nature that it would have probably changed the result," as required to grant a new trial.[23]  The Superior Court noted that Woodson had been accused of stealing drugs in evidence for use as drugs—either for personal consumption or sale—and no OCME employee had been accused of planting drugs to obtain false convictions.[24]  The Superior Court also determined that even without the seized drug evidence, the other "evidence is simply overwhelming."[25]  The Superior Court noted that Brown's voice was captured on wiretaps setting up the purchase of cocaine, he was observed arriving at Brooks' house and leaving several minutes later, and he was arrested with what he admitted was over 20 grams of cocaine that he intended to sell after receiving a proper *Miranda* warning.  After he was released, apparently unaware of the wiretaps, Brown also called Brooks and described his arrest, which the jury was able to hear at trial.  As a result, the Superior Court concluded that the new evidence of Woodson's alleged evidence-tampering "was not of a nature that it would have probably changed the result," and denied Brown's motion for a new trial.[26]  Brown

---

[23] *State v. Brown*, ID #1205025968A, at 3 (Del. Super. Dec. 18, 2014) (letter order) (citing *Hicks v. State*, 913 A.2d 1189, 1194 (Del. 2006)).
[24] *Id*. at 4 (citing 2014 WL 6734821, at *8-9 (Del. Super. Nov. 17, 2014)).
[25] *State v. Brown*, ID #1205025968A, at 6 (Del. Super. Dec. 18, 2014) (letter order).
[26] *Id*.

9

appealed the denial of that motion, and the Superior Court accordingly returned the matter to this Court.

### C. Return to the Supreme Court Following Remand

Before Brown filed his supplemental opening brief, the State provided him with the results from its re-testing of the substance seized from him after his arrest. The Superior Court had ordered the evidence to be re-tested in deciding on a motion for a new trial filed by Galen Brooks, who was tried separately. The results from that test, conducted by the independent NMS Labs, confirmed that the substance was in fact cocaine.[27] Although the NMS report does not delineate between powder and crack cocaine, it does provide that the total weight of the drugs was 22.08 grams, which is similar to the amount reported by the officers after Brown's arrest and by OCME, and is over 20 grams, the minimum required for a Tier 4 offense.[28] The NMS report was also consistent with Brown's own admission that he had an ounce of cocaine.

The re-testing results were not the only addition to the record following remand. After Brown filed his supplemental opening brief and the State responded, the State disclosed that Patricia Phillips, the OCME forensic examiner who tested the drugs seized from Brown and then testified at Brown's trial, had been suspended from the Division of Forensic Science (the successor to OCME) and later resigned. The State's documentation explained that there were three incidents leading to Phillips' suspension and resignation: she reportedly "lost" a bag of heroin in her lab coat pocket; she took

---

[27] App. to Supp. Answering Br. at 9 (NMS Labs Final Report).
[28] The amounts of cocaine reported by NMS in the five bags were: 6.83 grams, 6.60 grams, 2.15 grams, 6.05 grams, and 0.45 grams. *See id.*

10

evidence with her into the bathroom, a violation of protocol; and discrepancies were found in another case between the evidence found in her locker and her description of the evidence as logged in.[29] Brown argued that this additional evidence of misconduct by an OCME employee raised "a definite probability of adulteration or tampering," requiring reversal of his convictions.[30]

### D. BROWN'S CLAIMS ON DIRECT APPEAL

Before assessing the merits of Brown's motion for a new trial on remand, we need to address the claims raised by Brown in his direct appeal to this Court. Our evaluation of these claims is necessarily based on what the trial judge and parties knew at the time of Brown's trial. We conclude that none of these claims have merit, and therefore affirm his judgment of convictions.

Brown argues that the Superior Court erred in admitting into evidence recordings of his telephone calls obtained through the court-ordered wiretap. He contends that the police lacked probable cause to obtain a warrant to record his cell phone conversations because the police only had a "mere suspicion" that he would arrange a drug deal with Brooks.[31] Brown did not challenge the sufficiency of the evidence supporting the magistrate's determination that there was probable cause to wiretap Brooks' main

---

[29] *See* App. to Supp. Reply Br. at 23-24 (Corrective Action Request Form, Oct. 6, 2014); *id*. at 25-26 (Corrective Action Request Form, Oct. 9, 2014); *id*. at 27-29 (Corrective Action Request Form, Feb. 27, 2015).
[30] Supp. Reply Br. at 4.
[31] Opening Br. at 12.

11

telephone number. Instead, Brown challenges the breadth of the "net" cast by the wiretap to include the number Brooks was using on the date of Brown's arrest.[32]

Under 11 *Del. C.* § 2407(c)(1), a judge is permitted to authorize a wiretap if she determines "on the basis of the facts submitted by the applicant" that:

> a. There is probable cause for belief that an individual is committing, has committed, or is about to commit an offense enumerated in § 2405 of this title [including dealing in narcotic drugs]; b. There is probable cause for belief that particular communications concerning that offense will be obtained through the interception; c. Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and d. There is probable cause for belief that the facilities from which or the place where the wire, oral or electronic communications are to be intercepted are being used or are about to be used in connection with the commission of the offense or are leased to, listed in the name of, or commonly used by an individual engaged in criminal activity described.[33]

To establish probable cause, the Superior Court in issuing the wiretap warrant only needed to find that the State had presented facts which, under the totality of the circumstances, suggested there was a fair probability that Brooks had committed, or was about to commit, a crime.[34] As the Superior Court noted in denying Brown's motion to suppress the wiretap evidence in this case, "[t]he determination of probable cause by the issuing magistrate is entitled to great deference by a reviewing court."[35]

The Superior Court authorized the wiretap on Brooks' phone number on May 25, 2012, after it reviewed the State's Affidavit in Support of Application for Interception of

---

[32] Opening Br. at 13.

[33] 11 *Del. C.* § 2407(c)(1).

[34] *State v. Maxwell*, 624 A.2d 926, 930 (Del. 1993).

[35] *State v. Brown*, 2013 WL 4051050, at *2 (Del. Super. July 30, 2013) (citing *State v. Perry*, 599 A.2d 759, 765 (Del. Super. 1990)); *see also Jensen v. State*, 482 A.2d 105, 111 (Del. 1984).

Wire Communications. The Superior Court in Brown's case was within its discretion to find that the State's Affidavit provided a sufficient factual basis to determine that there was probable cause to authorize the wiretap. The State's Affidavit, a detailed 84 page document, stated that Brooks obtained a new pre-paid cell phone every forty-five days in an effort to avoid monitoring by the police. The State's Affidavit also explained that Brooks used a pattern to distribute the new number to his network: Brooks would call his contacts from the old phone number, tell them to answer the next call, and then call again from the new number minutes later. This pattern helped the police to identify Brooks' new phone numbers throughout the investigation, including the one he was using on the day that Brown was arrested. The State's Affidavit thus provided a sufficient factual basis for the magistrate to find probable cause to believe that Brooks was using a particular phone number, and that wiretapping that number would yield evidence of drug dealing. Because the police had probable cause to obtain the wiretap on Brooks' phone, the evidence that was obtained from his calls—including the drug deal he arranged with the unknown man later identified as Brown—was admissible. As a result, the Superior Court did not abuse its discretion in denying Brown's motion to suppress the evidence of the calls arranging the drug deal.

Brown also claims that the Superior Court abused its discretion by admitting the evidence seized from him after his arrest. He argues that the police did not have probable cause to arrest him at the time Sergeant Skinner stopped Brown's vehicle, and all of the

13

evidence obtained as a result "were the fruits of the illegal arrest."[36] Brown emphasizes that the police did not actually see him take part in a drug transaction, nor did the police recognize him as a known suspect involved in Brooks' drug syndicate. Brown asserts that it was premature for the police to assume he was the unknown caller, when it could have been Price, the man who left Brooks' house before Brown arrived.

But, as this Court has observed, "[a] finding of probable cause does not require the police to uncover information sufficient to prove a suspect's guilt beyond a reasonable doubt or even to prove that guilt is more likely than not."[37] To establish probable cause, the police are only required to present facts suggesting that a "fair probability exists that the defendant has committed a crime."[38] "The possibility that there may be a hypothetically innocent explanation for each of several facts revealed during the course of an investigation does not preclude a determination that probable cause exists for an arrest."[39] Probable cause is determined by the totality of the circumstances, as viewed by a reasonable police officer given her training and experience.[40] "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."[41]

---

[36] Opening Br. at 11.
[37] *Maulo v. State*, 27 A.3d 551 (Del. 2011) (quoting *State v. Maxwell*, 624 A.2d 926, 930 (Del. 1993)).
[38] *Jarvis v. State*, 600 A.2d 38, 42-43 (Del. 1991).
[39] *Maxwell*, 624 A.2d at 930.
[40] *Miller v. State*, 4 A.3d 371, 373-74 (Del. 2010).
[41] *Stafford v. State*, 59 A.3d 1223, 1229 (Del. 2012) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

In this case, the Superior Court found that "[b]ased on the totality of the circumstances, . . . a fair probability existed that Brown purchased cocaine and crack cocaine at Brooks' house, and that when he departed probable cause existed to believe he was then in possession of the drugs just purchased."[42]

The Superior Court was within its discretion to find that Sergeant Skinner had probable cause to arrest Brown. Based on the events leading up to Brown's arrest, an objectively reasonable officer who had listened to Brooks and the unknown man arrange a drug deal could have believed that Brown was the unknown man, that he purchased drugs as planned during the telephone calls, and that he still possessed those drugs at the time he was stopped. Contrary to Brown's argument, it was reasonable for the police to infer that the unknown man captured on the wiretap was Brown, both because Brown arrived at Brooks' house close to the time that the drugs were scheduled to be picked up and because the police had ruled out Price, who was not "unknown" to them.[43] Moreover, given the content of the discussion captured on the wiretap, it was reasonable for the police to infer that Brown and Brooks—who the police knew to be a cocaine dealer—had engaged in a drug deal when they were out of the camera's view, and that

_____

[42] *State v. Brown*, 2013 WL 4051046, at *2 (Del. Super. July 30, 2013).
[43] *See* App. to Answering Br. at 128 (Tr. Of Wiretap Motions, Test. of Skinner) ("The reason why we focused in on [Brown's] green van specifically is because no one else arrived there that we didn't already know. And what I mean by that is John Price had arrived, and we already knew what phone John Price was using and the vehicle he was driving and who he was, so when the green van arrived, we put two and two together and figured that was the person requesting the cocaine that I had heard on the telephone calls leading up to my going out to that area with the patrol vehicle."). Indeed, Price was profiled as a known member of Brooks' syndicate in the Affidavit in Support of Application for Interception of Wire Communications that the State submitted to obtain the wiretap which later captured Brown's telephone calls. App. to Answering Br. at 18 (State's Affidavit).

15

Brown was still in possession of those drugs minutes later, when Sergeant Skinner stopped his vehicle.[44] Because the police had probable cause to arrest Brown, there was no reason to exclude the fruit of the search of his body incident to that arrest, *i.e.*, the drugs that Sergeant Skinner found.[45]

Brown's last claim on direct appeal is more sensitive, given the alleged improprieties by OCME employees that came to light after his trial. As originally argued, Brown claimed that the State did not properly establish the chain of custody of the cocaine evidence. He contended that the discrepancies between the amounts and types of cocaine reported on the evidence bag labels and in the Medical Examiner's report showed that the drug evidence had been misidentified or tampered with. Brown objected to the admission of the cocaine evidence at trial, which the Superior Court overruled.[46] We review trial court rulings on the admissibility of evidence for abuse of discretion.[47]

"The proper standard for the admission of items into evidence over a chain of custody objection is whether there is a reasonable probability that the evidence offered is what the proponent says it is—that is, that the evidence has not been misidentified and no

---

[44] *Cf. State v. Lum*, 1978 WL 187981 (Del. Super. Ct. Nov. 22, 1978) (holding that the police had probable cause to arrest defendants when the parties planned a drug transaction in wiretapped telephone conversations, and then met as planned in the conversations).

[45] *See Stafford v. State*, 59 A.3d 1223, 1231 (Del. 2012) (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)).

[46] Opening Br., Ex. E (Trial Court Bench Ruling on Admission of Cocaine, Sept. 10, 2013) ("I don't think there's any reasonable possibility that the drugs got mixed up with some other drugs that were not on his person into those envelopes and from there the chain goes on without trouble. I think the objection goes to the weight of the evidence. So your objection is overruled. The item will be admitted.").

[47] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010); *Stickel v. State*, 975 A.2d 780, 782 (Del. 2009).

16

tampering or adulteration has occurred."[48]  Brown's central argument is that there were

too many discrepancies between the Police Evidence report and the Medical Examiner

report, including in the number of bags, the type (powder vs. crack), and the weight of the

cocaine, to support a "reasonable probability" that there had been no tampering or

misidentification of the evidence.

Given what the State itself has concluded regarding the improprieties by OCME

employees, it is perhaps conceivable that the discrepancy between the amount of cocaine

Brown claims to have been arrested with and the amount reported by OCME might have

been the result of someone in the chain of custody taking some of the cocaine for their

personal use, or errors consistent with a larger pattern of sloppiness.[49]  But at the time of

trial, before there was any awareness of problems in evidence-handling by OCME

employees, the Superior Court was entitled to credit the forensic examiner's testimony.

If true, her explanation of the differences between the amounts reported and the type of

cocaine observed in each bag satisfied a reasonable probability that the evidence had not

been misidentified.  The amount of drugs seized from Brown after his arrest and the

amount of drugs logged into evidence by OCME roughly matched, and both amounts

---

[48] *Word v. State*, 2001 WL 762854, *3 (Del. June 19, 2001); *see also McNally v. State*, 980 A.2d 364, 371 (Del. 2009) ("In chain of custody issues, the party attempting to admit the evidence must eliminate possibilities of misidentification and adulteration, 'not absolutely, but as a matter of reasonable probability.'") (quoting *Tricoche v. State*, 525 A.2d 151, 153 (Del. 1987)).

[49] Of course, it could also be that the difference in weights was so minor that there was no material discrepancy at all, consistent with the Superior Court's finding.  There are a myriad of "mights" in the world.  In this case, Brown claims to have had at least 28 grams of cocaine, which he purchased from his upstream supplier and then intended to resell to a downstream purchaser.  Shocking as it may seem, the possibility exists that Brown's supplier did not give him the full amount that he paid for, but an amount still indisputably above the statutorily relevant 20 grams.

17

totaled more than 20 grams of cocaine, the minimum requirement for a Tier 4 offense.

The trial judge was also able to observe the evidence personally, and have the forensic

examiner explain which bags of cocaine she had identified as powder or "chunky."[50]

Moreover, the State presented all the witnesses necessary to establish the chain of

custody, including the seizing officer (Sergeant Skinner), the packaging officers

(Sergeant Lloyd and Master Corporal Lavere), and the forensic chemist (Phillips).[51] As

the Superior Court correctly noted, when there is no clear abuse of discretion, any breaks

in the chain of custody go only to the weight, not the admissibility, of the evidence.[52]

Because there was a reasonable probability at the time of Brown's trial that the evidence

had not been misidentified or adulterated, we find that the Superior Court did not abuse

its discretion in admitting the cocaine seized from Brown.

### E.    BROWN'S CLAIMS FOLLOWING REMAND

Even with the new facts in the record following the revelations of alleged

misconduct by certain OCME employees, Brown's conviction should not be reversed.

Accordingly, we conclude that the Superior Court did not abuse its discretion in denying

---

[50] App. to Answering Br. at 176 (Tr. of Arguments, Sept. 10, 2013).

[51] *See* 10 *Del. C.* § 4331 (defining the "chain of custody" as the seizing officer, packaging officer, and forensic chemist); *see also Milligan v. State*, 2015 WL 3622880, at *7 (Del. June 10, 2015) (quoting *Demby v. State*, 695 A.2d 1127, 1131 (Del. 1997)) ("We have never interpreted [Delaware's chain of custody law] as requiring the State to produce evidence as to every link in the chain of custody. Rather, the State must simply demonstrate an orderly process from which the trier of fact can conclude that it is improbable that the original item has been tampered with or exchanged.").

[52] *Word v. State*, 2001 WL 762854, *3 (Del. June 19, 2001) (citing *Baker v. State*, 1988 WL 137190 (Nov. 21, 1988)).

Brown's motion for a new trial on remand.[53]  As the Superior Court correctly noted, a new trial is warranted if:

"(1) The new evidence is of such a nature that it would have probably changed the result if presented to the jury;

(2) The evidence was newly discovered; and

(3) The evidence must not be merely cumulative or impeaching."[54]

In Brown's case, the Superior Court determined that the evidence of alleged misconduct by OCME employees was newly discovered and not merely cumulative or impeaching, which the State does not dispute.  But the Superior Court found that "in the overall analysis, the Defendant's new trial motion must be denied because the evidence was not of a nature that it would have probably changed the result."[55]

In his supplemental briefing, Brown contends that the Superior Court abused its discretion in denying his motion for a new trial.  Brown argues that without the drug evidence, he "arguably" would have been acquitted.[56]  He also points out that all charges were dropped against Jermaine Dollard, who was also convicted for his role in the Brooks' drug syndicate, after re-testing revealed that the substance seized from him was not in fact cocaine.[57]

---

[53] *Hicks v. State*, 913 A.2d 1189, 1193 (Del. 2006) ("This Court reviews the denial of a motion for new trial for abuse of discretion.").

[54] *State v. Brown*, ID #1205025968A, at 2-3 (Del. Super. Dec. 18, 2014) (letter order) (quoting *Hicks*, 913 A.2d at 1194).

[55] *Id*. at 3.

[56] Supp. Opening Br. at 9.

[57] *Id*. (citing *State v. Dollard*, No. 1206010837 (Del. Super.)).

But Brown's case is distinguishable from *State v. Dollard*, where the defendant maintained throughout trial and on appeal that the substance seized from him was not cocaine.[58] When the State retested that substance following the revelations of OCME misconduct, it turned out not to be cocaine or any other drug. The State then dropped all charges against him.[59]

By contrast, Brown does not contest that the substance seized from him was cocaine; indeed, he requested that a letter he wrote to his attorney be placed on this Court's docket, in which he states, "I never contested that it was not cocaine. I am contesting the fact that drugs has come up missing."[60] In that letter, Brown asserts that he was arrested with over 29 grams of cocaine, *more* than any of the amounts suggested by Sergeant Skinner, Sergeant Lloyd, Master Corporal Lavere, OCME, or NMS. Even if that was true, all of the tests, and Brown's own statements, demonstrate that Brown had more than 20 grams of cocaine when he was arrested. Thus, by any count, Brown committed a Tier 4 offense, the level for which Brown was charged and convicted.[61] The slight discrepancy among the measurements reported by the police (21.2 grams), OCME (23.23 grams), and NMS (22.05 grams) would not have changed the result, and there was thus no prejudice to Brown.

---

[58] *See* App. to Supp. Opening Br. at 22 (Tr. of Oral Arg't, *State v. Dollard*, No. 1206010837 (Del. Super. Dec. 16, 2014)).

[59] *See* Supp. Opening Br., Ex. E (order vacating Dollard's conviction, Jan. 14, 2015).

[60] *Brown v. State*, No. 603, 2013, Filing ID 56928630 (letter dated March 12, 2015).

[61] *See* 16 *Del. C.* §4751C(2)(a) (defining 20 grams or more of cocaine or of any mixture containing cocaine as a Tier 4 Controlled Substances Quantity).

The alleged lack of professionalism in evidence-handling by employees of OCME, which has been the subject of investigations by the Delaware State Police and Delaware Department of Justice, among others, is deeply troubling, and we in no way want to suggest that this Court does not take the problem seriously. But as we observed in *State v. Ira Brown*, "there is no evidence that the OCME staff 'planted' evidence to wrongly obtain convictions. Rather, the employees who stole the evidence did so because it in fact consisted of illegal narcotics that they could resell or take for personal use."[62]

The revelation that OCME employees may have stolen drugs for their own use or were sloppy in handling evidence in certain cases should not result in the issuance of automatic get-out-of-jail-free cards to defendants like Anzara Brown. Instead, we must focus on the specific facts of each case, in light of the appropriate standard of review, to determine if a defendant was unjustly convicted. No unjust conviction resulted here, because the Superior Court correctly held that there was no rational probability that Brown was convicted on false premises. The Superior Court properly found that the other evidence of Brown's guilt—including his own admission that he possessed and intended to sell over 20 grams of cocaine—was overwhelming. Thus, the Superior Court was within its discretion to deny Brown's motion for a new trial, and we affirm the Superior Court's judgment.

---

[62] *Brown v. State*, 108 A.3d 1201, 1205 (Del. 2015).